MIGEROBE, INC., Plaintiff–Appellee,

v.

CERTINA USA, INC., Defendant–Appellant.

No. 89–7105.

United States Court of Appeals, Fifth Circuit.

March 1, 1991.

**1332**

Roy D. Powell, Jackson, Miss., Jon W. Tryon, Kirk L. Wolgemuth, Tryon, Friedman & Espenshade, Lancaster, Pa., for defendant-appellant.

Alex A. Alston, Jr., Darren J. LaMarca, Jackson, Miss., for plaintiff-appellee.

Before THORNBERRY, JOHNSON and DAVIS, Circuit Judges.

THORNBERRY, Circuit Judge:

A watch manufacturer appeals a jury verdict which held that it had breached an oral contract to deliver an order of watches to a retail operator. The jury held that the manufacturer was liable to the retailer for $157,133.00 in damages as a result of the breach. Finding that the retail operator presented sufficient evidence to support a finding of breach and sufficient evidence to justify the damage award, we AFFIRM.

## FACTS AND PROCEDURAL HISTORY

Appellant, Certina USA, is a watch manufacturer located in Lancaster, Pennsylvania. Appellee, Migerobe Inc., is a Mississippi corporation that owns and operates jewelry counters in McRae's department stores, which are located throughout the Southeast. This suit is based on the breach of an alleged oral contract that the two companies entered into in October 1987.

Certina sells its watches through the efforts of traveling salesmen, who are either salaried employees of Certina or independent representatives paid on a commission basis. Gerald Murff was one such representative, and his sales territory included Mississippi. Migerobe had purchased watches through Murff before, and, during the summer of 1987, Migerobe contacted Murff to notify him that Migerobe would be interested in buying Certina watches if the company decided to sell a large portion of its inventory at reduced prices. Migerobe suspected that Certina might make such an offer because another retailer recently had decided to stop carrying the Certina line of watches, and Migerobe believed that this would create a backlog of inventory for the manufacturer. In fact, Certina had decided to institute a special promotion to eliminate its inventory as a result of a corporate decision to withdraw its watches from the United States market.

Migerobe was hoping to acquire the Certina watches so that they could be used as "door-busters" for an After–Thanksgiving sales promotion. Doorbusters or "loss leaders" are items offered at a low price, which are designed to increase the traffic flow through a store and, thereby, increase corollary sales (the sale of non-advertised items). Murff later became aware that Migerobe was planning to use the watches in this special After–Thanksgiving promotion.

In a letter dated September 14, 1987, Murff responded to Migerobe's request, saying that he was "pursuing a special price on the Certina inventories on [Migerobe's] behalf" and that he would keep the company informed of his progress. *Migerobe Record Excerpts* at 5 (Plaintiff's Exhibit 64). At the time, Murff was attempting to negotiate a special discounted price with Certina's vice president of retail sales, William Wolfe. On October 21, 1987, Wolfe provided Murff with a list of watches from Certina's inventory that Murff could offer

to Migerobe at a price of forty-five dollars each. Murff scheduled an October 29 meeting with Migerobe to present the offer. Prior to this meeting, Murff requested and received an additional list of watches from Wolfe, which were to be included in the offer to Migerobe.

Murff kept his October 29 appointment with Migerobe. During the course of the day, Murff made several phone calls to Certina's home office in Lancaster, Pennsylvania to verify the number of watches in Certina's inventory, and to secure specific payment terms. After a full day of negotiating for particular quantities and styles as well as payment terms and a shipping date, Migerobe agreed to purchase over 2,000 Certina watches at a price of forty-five dollars each. Murff phoned Certina's Lancaster office one final time to report the sale, and Wolfe's administrative assistant recorded it onto a Certina order form.

On November 4, 1987, Certina's national accounts manager, Don Olivett, called Migerobe to say that Certina would not ship the watches that had been ordered on October 29. The president of Certina, John Gelson, later explained that the order was being rejected because the offered price was lower than that offered to other customers, and he feared that the offer might constitute a violation of the Robinson–Patman Act. Migerobe brought suit in district court for repudiation of the contract and, after a five-day trial, a jury awarded it $157,133.

After the district court denied its motion for judgment notwithstanding the verdict and for a new trial or remittitur, Certina filed a timely appeal. Certina urges us to reverse the district court based on several alleged errors. First, it argues that Migerobe failed to submit writings sufficient to satisfy the statute of frauds. Second, it argues that the district court misled the jury by failing to include one of Certina's suggested jury instructions as part of the charge to the jury. Third, it argues that Migerobe presented insufficient evidence to establish that Certina's salesman acted with actual, implied, or apparent authority in contracting for the sale of watches. Fi-

nally, Certina argues that Migerobe presented insufficient evidence to establish that Certina's failure to deliver the requested watches caused Migerobe to suffer a loss in corollary sales.

## DISCUSSION

### I. Statute of Frauds.

■■■ A writing must meet three requirements to satisfy the statute of frauds:

1) the writing must be "sufficient to indicate that a contract for sale has been made between the parties,"
2) the writing must be "signed by the party against whom enforcement is sought," and
3) the writing must specify a quantity.

Miss.Code Ann. § 75–2–201 (1972); *Perdue Farms, Inc. v. Motts, Inc.*, 459 F.Supp. 7, 13 (N.D.Miss.1978); *Derden v. Morris*, 247 So.2d 838, 839 (Miss.1971). The statute of frauds can be met through the integration of several documents, each of which alone might not be sufficient to meet these three requirements.

> A "writing" for the purposes of the statute of frauds may consist of separate writings, connected together by express reference to each other or internal evidence of their unity, connection, or relation; by so connecting the writings, otherwise separate documents may incorporate by reference the terms of each document.

*Hunt Oil Co. v. FERC*, 853 F.2d 1226, 1248 (5th Cir.1988) (citing *Affiliated Investments, Inc. v. Turner*, 337 So.2d 1263 (Miss.1976) and *Ludke Electric Co. v. Vicksburg Towing Co.*, 240 Miss. 495, 127 So.2d 851 (1961)). The signed writing need not refer explicitly to the unsigned writing; a Mississippi court would consider them to be integrated if the signed writing "makes[s] at least an implied reference to the other writing." *Ludke*, 127 So.2d at 854.

■■ In the case before us, the integration of two signed documents and one unsigned document tends to show that the parties had made a contract for sale. The two signed writings include an internal

memorandum from Wolfe to Certina's chief financial officer, R.B. Oliver, *see* Record, vol. 2 at 305, and an internal memorandum from Charles Westhaeffer, a clerical employee in charge of inventory control, to several other employees, *see* Record, vol. 2 at 309. The unsigned writing includes a Certina order form, *see* Record, vol. 2 at 307.

Of the two signed writings, the memorandum from Wolfe to Oliver, dated October 29, 1987, is the most enlightening. In relevant part, the memo states that "Jerry Murff *has been authorized* to sell" Certina watches to Migerobe at a special forty-five dollar price. (emphasis added). Wolfe goes on to explain that "Murff's commission on *this sale has been set* at 3% so that our net selling price *is* $43.65." (emphasis added). Certina claims that the purpose of this memorandum was to solicit authorization from Oliver so that Wolfe could go ahead with the Migerobe offer. But Gelson, the president of the company, ultimately determined that the sale should be rejected, not Oliver. Moreover, the language used in the memorandum does not support Certina's interpretation that the memorandum was simply a request for authorization. On the contrary, the only mention of authorization occurs in the past tense, indicating that Murff had already been authorized to make the sale.

The second signed writing is a memorandum to several Certina employees from Charles Westhaeffer, the person in charge of inventory control. The handwritten note announces that a new "promotion code has been set up to cover a special order from Migerobe." The note serves as further confirmation that a transaction had taken place between Certina and Migerobe. Additionally, the note contains the same promotion code, "03," that is found on the Certina order form that was completed by Wolfe's administrative assistant in Lancaster.

The pertinent unsigned writing, the Certina order form, lists, among other things, the quantity, styles, and prices of watches ordered. The form includes other information which tends to connect it with the Wolfe and Westhaeffer memos as well, such as the customer name, "Migerobe," the promotion code, "03," the name of the salesman, "Murff," and the initials of Charles Westhaeffer, dated "10/30," the same date on which he sent out the signed memo described above. The connection among these three documents was sufficiently strong to justify their integration into a writing that would satisfy the statute of frauds under Mississippi case law.

■ In its brief to this court, Certina alternatively argues that section 75–2–201(2) of the Mississippi Uniform Commercial Code allowed it to reject the Migerobe offer within ten days after it received a copy of the Migerobe purchase order. Section 75–2–201(2) of the Code provides for an alternate method of satisfying the writing requirement of section 75–2–201(1) of the Code and provides that:

> Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of [the statute of frauds] against such party unless written notice of objection to its contents is given within ten (10) days after it is received.

But, the issue whether the Migerobe purchase order served as a confirmatory writing under this section of the Mississippi Code was never presented to the lower court. *See Migerobe Brief* at 23. As a general rule, this court will not consider issues that are raised for the first time on appeal. *See Oliver v. Collins,* 914 F.2d 56, 60 (5th Cir.1990); *United States v. Garcia–Pillado,* 898 F.2d 36, 39 (5th Cir.1990). Moreover, section 75–2–201(2) does not apply to the situation now before us. Section 75–2–201(2) provides merchants with a method of satisfying the statute of frauds when an oral contract has been formed, but the signature of the party to be charged is lacking. *See Perdue Farms Inc. v. Motts, Inc.,* 459 F.Supp. 7, 13–14 (N.D.Miss.1978). In this case, we have two writings signed by Certina representatives, which, together with the unsigned Certina order form, are sufficient to establish a written contract.

Section 75–2–201(2) cannot be invoked to excuse a breach of that contract.

Wolfe's memorandum shows that Murff was authorized to offer Migerobe a discounted price on Certina watches, and the Certina order form and the Westhaeffer memorandum evidence Migerobe's acceptance of that offer. Taken together, these documents provide sufficient evidence to satisfy the statute of frauds.

*II. Jury Instructions.*

■ Certina received Migerobe's purchase order on November 4, 1987. On the back of that purchase order were ten terms, one of which stated that "[i]t is mutually agreed & understood that all terms and conditions set forth on this order are satifactory [sic] unless the seller notifies purchaser to the contrary, before shipment is made." *Certina Record Excerpts* at 25 (Plaintiff's Exhibit 4). Certina argues that if an oral contract existed between Migerobe and Certina, this term would have become a part of the contract under section 75–2–207 of the Mississippi Uniform Commercial Code and would have allowed Certina to cancel the order. Section 75–2–207 provides that additional terms found in an "expression of acceptance or a written confirmation" become a part of the contract unless the terms are objected to within a reasonable time. Certina requested that the district court instruct the jury on the incorporation of this additional term into the alleged contract. *See Certina Record Excerpts* at 9–11 (suggested jury instructions).

■ In evaluating the jury instructions issued by the district court in this case, we must determine whether the jury was misled in any way, and whether the members of the jury understood the issues before them and their duty to determine those issues. *See McCullough v. Beech Aircraft Corp.*, 587 F.2d 754, 759 (5th Cir. 1979). The jury was instructed, in relevant part, as follows:

An offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable under the circumstances. This means that under proper circumstances, a personal verbal acceptance, a telephone call or a purchase order may be construed as an acceptance to an offer to make a contract.

If you find by a preponderance of the evidence that Gerald Murff, acting with either actual, implied or apparent authority as an authorized agent of Certina, offered to make a contract to sell a certain number of watches of certain styles at $45 each to Migerobe and that Migerobe accepted the offer, or that Migerobe offered to buy a certain number of watches of certain styles at $45 each and that Certina's authorized agent accepted the offer then you should find that a contract was entered into between the parties.

If you find by a preponderance of the evidence that a contract was entered into by the parties and that Certina unequivocally repudiated or failed to perform the contract under its terms, then your verdict shall be for the plaintiff, Migerobe....

Record, vol. 5 at 699–700.

The court permitted the jury to decide what combination of oral communications and writings constituted the formation of a contract between Migerobe and Certina. The jury was not prevented from finding that the Migerobe purchase order was an integral part of that formation, and Certina was allowed to make this argument throughout the trial and during its closing arguments. However, a reasonable jury could have found that the contract between Migerobe and Certina was formed prior to the time Certina received the Migerobe purchase order. Integration of the Migerobe purchase order was not necessary for satisfying the requirement of the statute of frauds, because the Certina order form (completed a week earlier) provided the same information. Where a bargain becomes effective upon the execution of a contract several days before a purchase order is issued, the terms of a purchase order cannot be read together with the contract as an additional term of the agreement, because section 75–2–207 applies

only to the formation of contracts. *See* Miss.Code Ann. § 75–2–207 note at 239 (1972) (Scope) (citing *Columbia Nitrogen Corp. v. Royster Co.*, 451 F.2d 3, 9 (4th Cir.1971)).

The instructions given to the jury by the district court did not mislead the jury and there is no indication that the jury misunderstood the issues presented. On the contrary, a greater risk of misunderstanding could have arisen if the court had included Certina's suggested instruction. Such an instruction would have focused the jury's attention, perhaps prejudicially, on only one of the various documents that could have served as the basis for the alleged contract. We find no fault with the instructions provided by the district court nor with its refusal to include the instructions requested by Certina.

### III. Actual or Apparent Authority.

■ We use a deferential standard to determine whether the jury could have found that Murff had authority to contract with Migerobe for the sale of Certina watches. We will not overrule the findings of the jury unless the facts and inferences point so strongly in favor of Certina that a reasonable jury could not have arrived at a verdict to the contrary. *See Fairley v. American Hoist & Derrick Co.*, 640 F.2d 679, 681 (5th Cir.1981). Certina fails to meet this standard.

Actual authority may be express or implied. "It is deemed express if granted in either written or oral specific terms." *See Karam v. Travelers Ins. Co.*, 813 F.2d 751, 752 (5th Cir.1987). It is deemed implied if the authority is a necessary or incidental part of the express authority. *See id.*

The sale of Certina watches to Migerobe developed over a time frame of at least six weeks. During that time, Murff discussed the Migerobe sale with William Wolfe, Certina's vice president of retail sales, and Wolfe, ultimately, provided him with a list of Certina watches to offer Migerobe. Wolfe's follow-up memo to R.B. Oliver, Certina's chief financial officer, confirmed that "Jerry Murff ha[d] been authorized to sell" the watches. Based on these facts, a reasonable jury could easily conclude that Murff had been given express authority to conduct this particular transaction.

■ Murff's express authority was supplemented by the implied authority to do that which would be proper, usual and necessary for an agent in the exercise of his express authority. *See id.* In negotiating the sale with Migerobe, Murff possessed the implied authority to settle on the specific terms of the contract such as price (anything above $45.00), the specific quantity (within the limits set by Wolfe), and the specific styles.

Citing section 50 of the *Restatement (Second) of Agency*, Certina argues that the authority to solicit business for the principal does not translate into authority to contract for the principal. Although this proposition may be correct, Certina ignores the evidence which tends to show that, in this instance, Murff had received express authority to not only solicit business but to contractually secure that business as well.

■ Apparent authority exists when the principal clothes his agent with the semblance of authority such that a reasonably prudent person having knowledge of the business involved would be justified in believing, that the agent has the power the person assumes that he has. *See Andrew Jackson Life Ins. Co. v. Williams*, 566 So.2d 1172, 1180 (Miss.1990); *Clow Corp. v. J.D. Mullican, Inc.*, 356 So.2d 579, 582 (Miss.1978); *See also Terrain Enterprises, Inc. v. Western Cas. & Sur. Co.*, 774 F.2d 1320, 1322 (5th Cir.1985), *cert. denied*, 475 U.S. 1121, 106 S.Ct. 1639, 90 L.Ed.2d 184 (1986) ("Apparent authority is to be determined from the acts of the principal and requires reliance and good faith on the part of the third party.") In order to recover under a theory of apparent authority, a plaintiff must demonstrate the existence of the following three elements: 1) acts or conduct of the principal indicating authority, 2) reasonable reliance on those acts, and 3) a change of position by the third person to his detriment. *See Williams*, 566 So.2d at 1181. "Whether the evidence sufficiently meets the three-prong test of apparent

authority is an issue for the fact-finder." *Id.* Therefore, we will not reverse the jury's finding unless the evidence is such that no reasonable jury could have found apparent authority to exist. *See Fairley,* 640 F.2d at 681.

■ It is uncontested that Migerobe contacted Murff sometime during the summer of 1987 to express its interest in obtaining Certina watches at a discounted price. Murff responded with a September 14, 1987, letter stating that he was "pursuing a special price" for Migerobe. Murff was, in fact, negotiating for a special price with William Wolfe, Certina's vice president of retail sales. Wolfe eventually provided Murff with a list of watches that were to be offered to Migerobe for forty-five dollars each. By the time Murff arrived at Migerobe for his October 29 meeting, it was obvious to all involved that this was not a "routine" sales call. Migerobe reasonably expected Murff to present it with an offer in response to the company's request for special pricing, and Murff, with the blessing of Wolfe, fully expected to make such an offer. Wolfe was aware that Murff was to present this offer to Migerobe, and he provided Murff with all the materials necessary to make that offer. He provided Murff with an inventory list containing specific quantities and styles of watches that could be offered to Migerobe, and he authorized the selling price. While at Migerobe's offices, Murff referred to this inventory list and made phone calls to Lancaster, while negotiating with Migerobe, to double check on the accuracy of the list. Murff concluded his day, as he had done many times before, by phoning the order into the home office at Lancaster where Wolfe's administrative assistant accepted the order and completed a Certina order form.

Under the circumstances, a reasonable jury could have found that Wolfe's actions, together with Certina's operating procedures, clothed Murff with the apparent authority to act on its behalf in concluding this particular transaction. Also, we believe that a reasonable jury could have found that Migerobe was acting reasonably when it relied on the transaction. Finally, Migerobe presented sufficient evidence of a detrimental change in position as a result of its reliance; Migerobe had planned an entire Thanksgiving advertising campaign around the Certina watches, and the scope and thrust of that campaign had to later be changed as a result of Certina's breach.

## IV. Consequential Damages.

■ When Murff visited Migerobe on October 29, he was told that Migerobe planned to use the Certina watches as a "loss leader" item, featuring them in a "doorbuster" Thanksgiving advertisement at a fifty percent discount. A loss leader is an item normally offered for sale at or below cost, which functions to draw customers into the store, where they can make additional (non-advertised or corollary) sales. Retailers justify reduced profits on the sale of loss leaders by focusing on the increase in corollary sales that can be attributed to the loss leader advertisement. Migerobe had seen its corollary sales increase in the past when similar "doorbuster" or loss leader promotions were held. These past promotions also featured watches at a fifty percent discount. In 1982, the advertisement featured Seiko watches, and Migerobe saw its corollary sales increase by eighty-seven percent when compared to the week preceding the sale. In 1983 the advertisement featured Seiko and Pulsar watches, and corollary sales rose by sixty-nine percent.[1] Based on their experience within the retail industry and their knowledge of the Certina brand, the decision makers at Migerobe expected that a first time offer of Certina watches at a fifty percent discount would provide similar increases in corollary sales.

■ In order to recover for any losses it may have suffered in corollary sales as a result of Certina's breach, Migerobe must

---

**1.** Migerobe did not present evidence showing the percentage increase in corollary sales for the years 1984, 1985 and 1986. During those years, Migerobe apparently advertised several items, but it did not retain records that would allow it to distinguish between the sales of advertised items and the sales of non-advertised items.

show that Certina, at the time of contracting, had reason to know that such losses were possible and that the damages were proximately caused by the breach. *See* Miss.Code Ann. §§ 75–2–712(2) & 75–2–715(2)(b). "Loss may be determined in any manner which is reasonable under the circumstances" and does not require "mathematical precision." U.C.C. § 2–715 comment 4 (1968); *see also Nichols v. Stacks*, 485 So.2d 1034, 1038 (Miss.1986) (A plaintiff who "has produced the best evidence available to him, should not be denied recovery because the amount cannot be ascertained with the same precision as an ordinary claim for damages."); *Cain v. Mid–South Pump Co.*, 458 So.2d 1048, 1050 (Miss.1984) (same).

At trial, Migerobe presented evidence that it suffered $118,521 in lost profits that would have been realized on the direct resale of Certina watches and an additional $77,224 in losses from corollary sales. The jury, however, did not award Migerobe the total amount of damages requested ($195,745) but instead awarded it a total of $157,133.

Certina does not dispute the jury's award for that portion of Migerobe's loss attributable to the direct resale of Certina watches. It does, however, find fault with the evidence supporting that portion of the award attributable to the loss in corollary sales. Certina argues that Migerobe failed to demonstrate that Certina's breach was the proximate cause of the loss in corollary sales, and it claims that the evidence was too speculative and uncertain to support such an award.

We begin by noting that "the requirement of foreseeability is a more severe limitation of liability than is the requirement of substantial or 'proximate' cause in the case of an action in tort or for breach of warranty." [2] *Restatement (Second) of Contracts* § 351 comment a (1979) (comparing *Restatement (Second) of Torts* § 431 and U.C.C. § 2–715(2)(b)). The loss of corollary sales by Migerobe was a fore-

seeable consequence of Certina's breach; the very purpose of a loss leader promotion is to increase the amount of corollary sales, and Migerobe has shown that Certina knew that the watches would be used for this purpose.

Through a combination of expert testimony and circumstantial evidence, Migerobe successfully provided the jury with a reasonable basis on which it could conclude that corollary sales would have been higher if Certina had performed its part of the bargain. Migerobe began by presenting historical data which showed that it could expect such promotions to increase its corollary sales by an average of seventy-eight percent. Migerobe then solicited testimony from an expert economist that a first time offer of Certina watches at a fifty percent discount would provide results similar to those experienced in 1982 and 1983. The expert relied on additional evidence suggesting that Certina was peaking in name recognition among Migerobe customers and that Certina's strongest market was in the southeastern United States where Migerobe retail outlets were located. Under the circumstances, Migerobe presented the best possible evidence available to demonstrate proximate cause. "[I]t is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses." *Boeing Co. v. Shipman*, 411 F.2d 365, 375 (5th Cir.1969) (en banc). The evidence presented was such that a reasonable jury could conclude that Certina's breach was the proximate cause of Migerobe's loss in corollary sales.

Certina next argues that Migerobe's estimate of corollary damages must be rejected as being too speculative and uncertain. Migerobe's estimate of these losses was based on the success of similarly advertised "doorbuster" sales that it had held in 1982 and 1983. Certina begins by noting that Migerobe had never used Certina watches as a doorbuster item in the past,

---

**2.** The showing required of a plaintiff for an award of consequential damages is the same for a breach of contract and a breach of warranty.

*See* Miss.Code Ann. §§ 75–2–712(2) & 75–2–715(2).

and, therefore, its potential for increasing corollary profits was unknown. It also claimed that the watches used in doorbuster sales during 1982 (Seiko) and 1983 (Seiko & Pulsar) were better known than Certina and could not provide an accurate comparison. As already noted, it is unnecessary for a plaintiff to prove his losses with mathematical precision, and we do not believe that a sales estimate based on historical data from similar advertising campaigns would have rendered this estimate speculative or uncertain. *Cf. Hoefferle Truck Sales, Inc. v. Divco–Wayne Corp.,* 523 F.2d 543, 551 (7th Cir.1975) (Prior and subsequent sales data used to establish lost profits); *Terrell v. Household Goods Carriers' Bureau,* 494 F.2d 16, 23 (5th Cir.), *cert. dismissed,* 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974) (Sales and distribution data used to estimate lost profits); *Autowest, Inc. v. Peugeot, Inc.,* 434 F.2d 556, 564–65 (2nd Cir.1970) (sales projections based on prior sales data could be used in establishing damages). Certina is not entitled to complain about Migerobe's inability to provide a more precise estimate when such precision has been made all but impossible because of Certina's own breach. *See Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931); *see also Terrell,* 494 F.2d at 24 ("Very often the nature of the wrong makes ascertainment of the damages difficult."); *Autowest,* 434 F.2d at 565 ("The wrongdoer should bear the risk of uncertainty that his own conduct has created.").

Certina next complains that the variables used to measure Migerobe's corollary sales did not remain constant throughout the years being compared. At the trial stage of this lawsuit, corollary sales were defined as all jewelry items that were sold except for those items that were advertised. In 1982 and 1983, watches were the only items that were advertised; therefore, any other item of jewelry sold during those years constituted the total amount of corollary sales. In 1987, however, three additional items, besides watches, were advertised. Therefore, the amount of sales generated by these three additional items, in addition to the sales generated by the advertised watches, were removed from the definition of corollary sales for 1987. Certina argues that the removal of these additional items from the pool constituting corollary sales produced a false perception that corollary sales had fallen as compared to prior years. Under different circumstances, this might be a persuasive argument, but a noticeable drop in corollary sales is apparent even when these three items are placed back into the pool constituting corollary sales. Certina's own calculations show that under such conditions, corollary sales would have risen by only seventeen percent, still far short of the increases seen in 1982 and 1983. *See Certina Record Excerpts* at 33.

We stress once again that Migerobe is not required to prove corollary sales to an established level of mathematical precision. The evidence only needs to provide an approximation of the damages as a matter of just and reasonable inference. *See Story Parchment,* 282 U.S. at 563, 51 S.Ct. at 250; *Terrell,* 494 F.2d at 24; *see also Nichols v. Stacks,* 485 So.2d 1034, 1038 (Miss. 1986) (recovery will not be denied to a plaintiff presenting the best available evidence as long as it is sufficient to afford a reasonable basis for estimating the loss); *Cain v. Mid–South Pump Co.,* 458 So.2d 1048, 1050 (Miss.1984) (same). The evidence presented by Migerobe provided the jury with a sufficient basis on which to estimate corollary damages, and we will not disturb that determination.

## CONCLUSION

For the foregoing reasons, we AFFIRM the jury's finding of a contractual breach by Certina as well as the jury's award of damages to Migerobe in the amount of $157,133.00.